# IN THE SUPREME COURT OF THE STATE OF DELAWARE

TYRONE BUSSEY,

    Defendant Below-
    Appellant,

v.

STATE OF DELAWARE,

    Plaintiff Below-
    Appellee.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 224, 2016

Court Below: Superior Court
of the State of Delaware

ID No. 1503013837A

Submitted: March 15, 2017
Decided: March 31, 2017

Before **STRINE**, Chief Justice; **HOLLAND** and **VAUGHN**, Justices.

## ORDER

On this 31st day of March 2017, upon consideration of the parties' briefs and the record of the case, it appears that:

(1) Appellant, Tyrone Bussey, appeals from a Superior Court jury verdict finding him guilty of numerous charges stemming from a domestic disturbance. Bussey makes one claim on appeal. He contends that the trial court abused its discretion in denying his motion for judgment of acquittal on the following counts of the indictment: two charges of Aggravating Menacing, two charges of Possession of a Firearm During the Commission of a Felony ("PFDCF"), and three counts of Endangering the Welfare of a Child.

(2) On March 21, 2015, police officers were dispatched to 410 West 7th Street, Laurel, Delaware, for a call related to a domestic disturbance. A 911 call

from neighbors, Doris Taylor and Tyreshia Taylor, gave law enforcement a description of the incident. Doris Taylor resided across the street diagonally from the victim's home. Doris informed police that the victim, Kolanda Shelton, was involved in a physical altercation with a male.

(3) Shelton spoke to a first responder on the scene and another officer after she was transported to the hospital. On the day of the incident, Shelton was involved in a physical altercation with her boyfriend, Tyrone Bussey. The argument started because Shelton did not have the television repaired. Shelton told the first responder that Bussey punched her in the face and held a gun to her head. He also threatened to kill her. She further stated that when Bussey heard the police coming, he threw the gun and took off running. Shelton said that Bussey retrieved the gun from behind or in the vicinity of the television. Shelton told the officer that she was not aware that there were any weapons in the residence.

(4) From there, Shelton told her oldest son, Windonald Paul, Jr. ("Paul"), to run to the neighbors for help. At that point, Bussey pointed the gun at Shelton's son and threatened to kill both of them if the police arrived. After Paul exited the residence to get help, Bussey put the gun in his waistband and ordered Shelton outside. Shelton told the officer that she ran out the door in an effort to get away from Bussey, but he grabbed her and threw her down. She believed Bussey pointed the gun at her and threatened to kill her again. Next, Bussey ordered Shelton to go

2

to the backyard of the residence, but Shelton refused. When asked why she refused, Shelton stated that she thought Bussey was going to kill her. From there, Bussey dragged Shelton to the rear of the property. After hearing the police arrive, Bussey threw the gun and ran from the scene.

(5) As his mother was being transported to the hospital, an officer spoke to Shelton's son, Paul. Paul voluntarily provided a statement to police. He stated that he witnessed his mother and Bussey engaged in a verbal argument. From there, Paul observed Bussey punch his mother in the face and retrieve a gun from behind the television. Paul explained to the officer that his mother told him to leave the house and go get help. He stated that Bussey pointed the gun at him and told him that if the police came Bussey was going to kill him and his mother. Paul told the officer that he ran across the street and told a neighbor to call the police.

(6) After arriving on the scene, the police were able to locate a gun in a pot next to the stairs to the backdoor. That evening, Bussey was apprehended by police. He was brought in front of the Justice of Peace and a no-contact order was issued on March 22, 2015. The no-contact order was signed by the defendant. Specifically, the no-contact order prohibited Bussey from having contact with Shelton, Paul, and Shelton's three other children.

(7) Despite the no-contact order, Bussey made contact with Shelton via the telephone and mail while he was in jail. He used another inmate's state bureau

3

identification number to place the calls to Shelton. There were a "total of 26 phone calls to . . . Shelton's number from Donald Flower's phone account" between March 21, 2015 and June 21, 2015.[1] During these phone calls, Bussey attempted to tell Shelton what to do in relation to the pending criminal charges against him. "Just make sure you don't come no matter what, you feel me? I might have to take this s--t all the way."[2] He instructed Shelton, "[i]f they call you to trial, just tell them you – just drop it, you feel me? Tell them what you told the lawyer or whatever."[3]

(8) In a series of phone calls played during the trial, Bussey and Shelton discussed the case. In the first call, Bussey confronted Shelton because he heard that Shelton told the police where to find the gun. Shelton responded that she "didn't even know where [he] set it at."[4] From there, Bussey stated that the police or the State were going to try to scare her and "that she shouldn't pay any mind to that because they can't do s--t."[5]

(9) In the second call entered into evidence, Bussey told Shelton that "the only evidence [the State] had against him was her and her son Paul's statements about the gun."[6] He asked Shelton to bail him out of jail because he needed to get out of jail to better explain things to Shelton. A synopsis of the other phone calls

---

[1] App. to Appellee's Answering Br. at 65.
[2] *Id.* at 67.
[3] *Id.*
[4] *Id.* at 68.
[5] *Id.*
[6] *Id.*

4

shows that Shelton set up an appointment with Bussey's attorney to tell him that her son's statement to police was not correct. In the next call, Bussey told Shelton that "she wouldn't get in very much trouble if she changed her story."[7] He again stated that he needed to get out of jail so that he can speak to her. He stated, "[h]ave your ass go in there prepared and know what the f--k you got to do, you feel me?"[8] In that same call, Bussey told Shelton, "[you can't] be charged with perjury because [you weren't] under oath when [you] gave [your] statement to the police."[9]

(10) In another call where Bussey and Shelton discussed Shelton's upcoming meeting with his attorney, he stated, "[a]bout tomorrow, make sure you go in there and, you feel me, your whole main focus is just, I never had s--t, you feel me? All the other s--t about your son and all that, none of that ever happened."[10] Shelton, in discussing the gun, said, "[a]nd that could be, like, that was my gun and I put it back there fixing to try and plant it on you."[11]

(11) In a sixth call, Bussey and Shelton discussed her revised statement that she gave to Bussey's attorney. Shelton read Bussey her new statement over the phone. Shelton further told Bussey, "I didn't know what the hell to say. I was just - - I was just, like - - anything to take the gun attention off of you."[12] During the last

---

[7] *Id.* at 71.
[8] *Id.*
[9] *Id.*
[10] *Id.* at 72-73.
[11] *Id.* at 74.
[12] *Id.* at 75-76.

call played for the jury, Bussey continued to encourage Shelton not to press the charges.

(12) At trial, both Shelton and Paul's testimony differed from their original statements. Shelton testified that she lied about Bussey's use of a gun in order to get Bussey in trouble for hitting her. She further stated that she accidentally fell and that Bussey "was still walking, pulling me, tugging away from me, and I was just holding him."[13] She denied that once outside of her residence that Bussey hit her or physically dragged her. She stated that she followed Bussey around the house as he walked away.

(13) Shelton testified that after Bussey left the premises, she went back into her home, retrieved the handgun, came back outside, "tossed the gun and ... ran out towards police."[14] When asked where she got the gun, Shelton stated that she found the gun at Laurel Park and brought it home at an earlier date. She stated that Bussey told her to get rid of the weapon, but she had not done so before this incident. She stated that she planted the gun outside of her home to get Bussey into trouble.

(14) Paul testified that he did not know why the police came to his residence on the day of the incident. He said that his mother told him to go across the street to call 911. Paul claimed that he was telling the truth when he spoke with officers on the day of the incident, but testified that he did not tell the police that he saw a gun.

---

[13] App. to Appellant's Opening Br. at 018.
[14] *Id.* at 025.

6

(15) During the trial, Tyreshia and Doris Taylor testified for the State. Tyreshia stated that on the night of the incident, Paul came to her grandmother, Doris', house and said that his mother wanted him to call the police. Doris asked Paul if he was serious, and Paul called to his mother to confirm that she wanted him to call the police. Shelton confirmed she wanted the police called, and Doris called the police. Tyreshia testified that Paul went back to his mom and Shelton made him go back to Doris' house. Next, Tyreshia testified that she observed Shelton arguing with a man and stated that there "was a lot of hand motions and yelling."[15] After that, Tyreshia testified that she saw a man pull out a gun and that he was holding it towards Shelton's face. She also saw the man strike Shelton and drag her around to the back of her residence.

(16) Doris testified to generally the same information as Tyreshia. She stated that when she asked Paul if he was sure his mother wanted her to call the police, Paul squatted behind a car and called over to his mom to confirm. Doris stated that there is "a big tree sitting there, and he was down in between them where he didn't want to be seen."[16] From there, Doris called 911 while she stayed on the porch. She testified that Tyreshia was calling out her observations and that she relayed the information to the 911 operator. She stated that the next time she looked up, she

---

[15] App. to Appellee's Answering Br. at 28.
[16] App. to Appellant's Opening Br. at 047. Doris further stated that Paul called over to his mother is a low voice. *Id.*

7

observed Shelton being dragged to the back of her home. In addition, Doris testified that she saw Shelton's two daughters standing at the upstairs window while the altercation was going on. On cross, Doris stated that she had not actually seen the gun herself.

(17) At the close of the State's case, Bussey moved for a judgment of acquittal as to counts one, two, three, four, nine, ten, and eleven. The Court formally denied the motion as to counts one through four. The trial judge chose to reserve judgment on the motion as to counts nine through eleven. The trial judge never formally ruled on the motion.

(18) This Court reviews an appeal from the denial of a motion for judgment of acquittal *de novo*.[17] Specifically, this court examines "whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of all the elements of the crime."[18]

(19) On appeal, Bussey contends that the trial court abused its discretion in denying his motion for judgment of acquittal on specific counts in the indictment. Bussey claims that the State did not meet its burden for the following charges: Aggravated Menacing of Paul, Aggravated Menacing of Kolanda Shelton, two counts of Possession of a Firearm During the Commission of a Felony related to the Aggravated Menacing charges, and three counts of Endangering the Welfare of a

---

[17] *Cline v. State*, 720 A.2d 891, 892 (Del. 1998).
[18] *Id.*

Child. There is no merit to Bussey's argument, and therefore, the jury verdict should be affirmed.

(20) In a jury trial, it is "the duty of the jury to determine if the State ha[s] proved each necessary element of the charges beyond a reasonable doubt and, in making such determination, it does not have to accept the total testimony of one witness."[19] "[T]he jury is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony."[20]

(21) "A person is guilty of aggravated menacing when by displaying what appears to be a deadly weapon that person intentionally places another person in fear of imminent physical injury."[21] Bussey claims that because both Shelton and Paul testified at trial that Bussey did not have a gun during the altercation, and because no evidence was introduced about whether they were "in fear of imminent physical injury," the State did not meet its burden in proving the Aggravated Menacing charges.[22]

(22) Over the course of the trial, the jury was presented with conflicting testimony as to what happened on June 22, 2015. Shelton and Paul gave testimony that differed from their original statements, which they provided separately to police. Namely, at trial, Shelton contended that she had made up the majority of her original

---

[19] *Tyre v. State*, 412 A.2d 326, 330 (Del. 1980).
[20] *Id.*
[21] 11 *Del. C.* § 602.
[22] *Id.*

9

statement to police, and Paul claimed that he did not remember what he told police about the night of the incident. While on the stand, Paul distinctly stated that he never told the police about a gun and that he had not seen a gun that evening. The State introduced Shelton and Paul's prior statements from the night of the incident pursuant to 11 *Del. C.* § 3507.[23] In addition to the § 3507 statements, the State presented evidence of Bussey's contact with Shelton, despite the no-contact order, via the recordings of their telephone conversations. These calls show the development of what became Shelton's trial testimony.

(23) Although conflicting evidence was presented at trial, the State did present sufficient evidence to sustain a guilty verdict as to the Aggravated Menacing charges. In the §3507 statements presented at trial, both Shelton and Paul told the police that Bussey pointed a gun at them and threatened to kill both of them if the police arrived. As the trier of fact, the jury had the sole responsibility for resolving conflicts in the testimony presented and determining the credibility of each witness. It is clear based on the verdict that the jury found Shelton and Paul's original statements to police, coupled with other testimonial evidence, to be more credible than their trial testimony. In determining that Shelton and Paul's original statements were credible, the jury could have reasonably inferred that when an individual's life is threatened with a gun that individual may be afraid. Therefore, in viewing the

---

[23] 11 *Del. C.* § 3507(a).

10

evidence in the light most favorable to the State, a rational trier of fact could have found Bussey guilty of Aggravated Menacing as to both Shelton and Paul.

(24) For the same reasons as above, Bussey's claim that the State did not present sufficient evidence to prove the Possession of a Firearm During the Commission of a Felony charges lacks merit. From the evidence presented, a rational juror could conclude that Bussey was in the possession of a firearm during the commission of a felony (Aggravated Menacing). Again, a rational jury could determine that Shelton and Paul's prior statements to police that Bussey had a gun were more credible than their trial testimony. Additionally, Tyreshia Taylor testified that she saw a man with a gun at Shelton's house. Therefore, Bussey's claim lacks merit.

(25) Lastly, Bussey argues that the State presented insufficient evidence to sustain a guilty verdict for three counts of Endangering the Welfare of a Child.[24] "A person is guilty of endangering the welfare of a child when . . . [t]he person commits any violent felony . . . knowing that such [act] was witnessed, either by sight or sound, by a child less than 18 years of age who is a member of the person's family or the victim's family."[25] In his opening brief, Bussey argues that "no evidence [was] presented via [§] 3507 statements nor witness testimony that the children, saw

---

[24] 11 *Del. C.* § 1102.
[25] *Id.*

11

nor hear[d] the altercation."[26] However, Doris Taylor provided testimony that she saw at least two of the three children in the window of the residence as the altercation between Shelton and Bussey was going on. In addition, segments of Shelton and Paul's testimony supported a finding that all three other children witnessed, "either by sight or sound,"[27] the underlying felony.

(26) During cross-examination, Shelton stated that the children were upstairs at the time of the altercation and said that she was "pretty sure they w[ere] sleeping because [she] didn't hear any sounds."[28] During direct, Paul stated his brothers and sisters were upstairs when the altercation started and that they were "on their way to sleep."[29] During the motion for judgment of acquittal, the State argued that Paul testified to going back up to bedroom after returning home from the Taylor residence. In discussing the size of her home, Shelton stated that the home was two stories and was "not really" a big house.[30] She stated that all four children shared a bedroom and that the room was positioned on the front of the house and had a window in it.

(27) Taking the above testimony as a whole and looking at it in the light most favorable to the State, a rational trier of fact could have determined that the State

---

[26] Appellant's Opening Br. at 15.

[27] 11 *Del. C.* § 1102(a)(4).

[28] App. to Appellant's Opening Br. at 032.

[29] *Id.* at 038.

[30] App. to Appellee's Answering Br. at 45.

proved each element of the offense. Taylor's testimony established that two of Shelton's children were looking out the window during the altercation. Additionally, the size of the house as well as the position of the children's room on the front of the house supports the reasonable inference that all of the children saw or heard the altercation. While Shelton and Paul contend that the children were in varying states of going to sleep at the time of the incident, it is reasonable to assume that if Paul could hear his mother from the room, the other children could hear the altercation as well. Thus, the Superior Court did not err in implicitly denying Bussey's motion for judgment of acquittal as to the Endangering the Welfare of a Child charges.

NOW, THEREFORE, IT IS THE ORDER of the Court that the judgement of the Superior Court is AFFIRMED.

BY THE COURT:

_____
Justice

13